In the Matter of Henry DANESI, Sr., Bankrupt.

Bankruptcy No. 79 B 0158.

United States Bankruptcy Court, S. D. New York.

Oct. 15, 1979.

Hahn, Hessen, Margolis & Ryan, New York City, for plaintiff.

Jeffrey L. Sapir, Yonkers, N. Y., for Bankrupt.

Fredericks & Goldberger, White Plains, N. Y., for Bankrupt.

DECISION ON COMPLAINT OBJECTING TO BANKRUPT'S DISCHARGE AND TO HAVE DEBT DUE RUSCH FACTORS DECLARED NONDISCHARGEABLE

HOWARD SCHWARTZBERG, Bankruptcy Judge.

The plaintiff, a creditor who has obtained a judgment against the bankrupt in connection with the bankrupt's guarantee of the obligations of a corporation of which he was secretary seeks to bar the bankrupt's discharge or, in the alternative, to have its claim determined to be nondischargeable. The plaintiff's action is bottomed on the charge that the bankrupt, while engaged in business as an executive of a corporation, obtained money or property on credit for such business as a result of a materially false statement in writing respecting his financial condition.

The bankrupt denied the essential allegations of the complaint. Both sides appeared at the trial, which resulted in the following Findings of Fact and Conclusions of Law:

## FINDINGS OF FACT

1. The bankrupt filed his voluntary petition in bankruptcy on February 1, 1979 and was thereupon adjudicated.

2. He had been a fifty percent stockholder and secretary of Supreme Synthetic Dyers, Inc., ["Supreme"] a New York Corporation which filed a voluntary petition in bankruptcy in the United States District Court for the Eastern District of New York in 1975. The other stockholder of the corporation was Lewis Sheffler.

3. The plaintiff, Rusch Factors, Division of BVA Credit Corporation ["Rusch"] is a factoring and commercial finance company of a banking corporation doing business in New York City.

4. In April, 1974, plaintiff agreed to enter into a factoring arrangement with Supreme and to take over accounts receivable that had previously been assigned by Supreme to its then factor, International Credit Corp. Plaintiff advanced $810,000 in connection with the take over.

5. As part of the factoring transaction with their corporation, the bankrupt and the other officer of Supreme, Lewis Sheffler, were required to submit their personal financial statements to the plaintiff. The bankrupt delivered to the plaintiff a one-page document dated March 15, 1974 enti-

tled "Statement of Personal Assets." [Exhibit # 1C]. In this statement the bankrupt reported total assets of $273,474, including a home valued at $175,000, less a mortgage of $30,948; cash of $98,672; cash surrender value of life insurance amounting to $15,000 and some Wellington Fund Shares valued at $15,750. The statement contained the following note from the accountants who prepared it: "This statement was prepared by us without audit from information supplied to us by Henry Danes."

6. The other shareholder of Supreme, Lewis Sheffler, also submitted a "Statement of Personal Assets" to the plaintiff, dated March 15, 1974, with a similar legend at the bottom by the same accounting firm who prepared the bankrupt's statement. [Exhibit # A]. However, Sheffler's statement not only sets forth his assets, but also his liabilities, which when subtracted from his assets, results in a net worth figure which was also set forth in the statement.

7. Significantly, the bankrupt's statement makes no reference to his liabilities, other than his mortgage, and does not purport to disclose his net worth.

8. When the bankrupt submitted his statement of personal assets to the plaintiff in April, 1974, he was not then the sole owner of the home listed on the statement. On November 9, 1973, the bankrupt recorded a deed to the home in question reflecting a transfer of his sole interest to his wife and himself as joint tenants, in consideration of "love and affection and one dollar." [Exhibit # 12]

9. Although this deed had been recorded, the plaintiff never checked the title to the house in question and only learned of the conveyance after it obtained a judgment against the bankrupt with respect to his personal guaranty of the obligations of Supreme.

10. The bankrupt gave the accountants who prepared the statement the same type of financial information that he and his wife reported on their joint income tax return and therefore he included the house and cash since some of the $98,000 reported cash included bank accounts owned by his wife.

11. The bankrupt testified that when he submitted the statement of his assets he never expected to be called upon to sign a personal guarantee of the obligations of Supreme. He did not learn of the guaranty requirement until after he arrived at the closing on April 24, 1974. He said that it was his first and last personal guarantee.

12. The plaintiff's representatives testified that they relied upon the statement as to the bankrupt's assets. The plaintiff's former president testified that he didn't have to investigate the facts in the statement because the accountants who prepared the statement had a good reputation in the soft goods industry and their financial statements were quite acceptable to him. [Trans. pp. 88, 89]

13. In support of the contention that the plaintiff relied upon the financial statement, plaintiff's vice president referred to a memorandum dated May 20, 1974 in his credit file which stated: ". . . we hold *personal guarantees* which we feel to be satisfactory." [Emphasis added] No reference was made to the financial statement. Thus, reliance was placed upon the bankrupt's personal guarantee. When asked for additional evidence with respect to this subject, plaintiff's vice president stated that when he approved an additional $100,000 advance to Supreme in July, 1974 his "approval of that over-advance relied on the *personal guarantees* that we had at the time." [Trans. p. 28]

14. A document in the plaintiff's files dated July 10, 1974, entitled "Request For Client Accommodation" [Exhibit # 7] which was approved by plaintiff's president and vice president contains the following comment:

"This is a new client which is in the sales yarn business and commission dyer of knitting yarn. Because of the slow down in business during the summer months, client has requested a seasonal over advance. We hold *personal guarantees* of Messrs. Sheffler and Danesi which we feel are satisfactory." [Emphasis added]

No reference was made to any financial statement concerning the bankrupt.

15. At the conclusion of the vice president's direct examination he was asked to tell the court "in his own words to what extent, if any, did Rusch Factors rely upon defendant's financial statement in Exhibit 1C." [Trans. p. 52] The court pointed out that the witness never said he relied upon the financial statement and that "the only testimony is that they relied upon the *guarantee*" [Emphasis added] [Trans. p. 53] Plaintiff's counsel then asked the witness if he relied on the financial statement, to which he answered: "Yes, that's the only way we would know what the financial condition is of the guarantor." [Trans. p. 53]

16. It is clear that the plaintiff, a sophisticated and experienced financial factor could not possibly "know what the financial condition is of the guarantor" from a reading of the financial statement in question. Aside from the reference to the mortgage there is no indication at all as to the extent of the bankrupt's liabilities. A statement of assets is meaningless unless one can ascertain to what extent the assets are unencumbered by judgment liens and secured claims. A reflection of assets without liabilities precludes a determination of net worth.

17. Although the plaintiff's vice president and former president thereafter testified that they relied upon the financial statement, there was no justification for such reliance. Indeed, the plaintiff's former president testified that he was familiar with the name Danesi Realty Corporation and that the bankrupt "either directly or through a company whose stock he held owned the real property in which the dying operation was located." [Trans. p. 79] This corporation nor its stock was not listed in the so-called financial statement and nevertheless the plaintiff would have this court believe that its sophisticated business executives chose to rely upon this patently incomplete document as a basis for advancing $810,000 to take over the accounts receivable of Supreme and to make substantial

over advances during its operation. This position is inconsistent with operations of an experienced financial institution, which the plaintiff undoubtedly is.

18. Apart from the issue of reliance, the plaintiff has not established by a preponderance of the evidence that the bankrupt intended to deceive the plaintiff by the submission of a materially false statement with respect to his financial condition. There is no question that the bankrupt regarded his home as an asset. That he held title to the home jointly with his wife was a matter of public record which could be ascertained from the real estate records in the local county clerk's office. The ambiguous listing of the home in the financial statement, without a description of the manner in which title was held, is not of itself proof of an intention to deceive.

19. The bankrupt's transfer of his sole interest in the home to his wife and himself as joint tenants on November 9, 1973 and the recordation of a deed to this effect is not the subject of the complaint in this action. The issue is not whether such previous conveyance constituted a fraudulent transfer within the meaning of the Bankruptcy Act. The only issue before this court is whether the listing of the home in the financial statement, without additional explanatory information to indicate that the bankrupt's interest was joint rather then total, is sufficient basis for concluding that he intended to deceive the plaintiff by the misstatement of a material fact. Manifestly, if the plaintiff felt that the manner in which the bankrupt held title to the house was material to the furnishing of credit to Supreme, the plaintiff should have questioned the ambiguity in the patently insufficient financial statement. If the plaintiff sought a precise description as to the nature of the bankrupt's ambiguously stated interest in his home, reasonable prudence would have dictated that the plaintiff should have requested a more definite statement as to title. It is not uncommon for married people to place their home in joint interest and still regard their home as an individual asset.

20. On March 17, 1975, Supreme was adjudicated a bankrupt by the Bankruptcy Court in the United States District Court for the Eastern District of New York. [Exhibit # 10]

21. Thereafter, plaintiff obtained a judgment against the bankrupt under his personal guarantee in the sum of $147,541.92, which was entered in the County Clerk's Office in the Supreme Court of the State of New York, New York County, on October 6, 1977, [Exhibit # 11], which amount the plaintiff seeks to recover in this action directed to the bankrupt's discharge.

22. Having found that the plaintiff has failed to establish by a preponderance of the evidence reasonable reliance upon the financial statement in question or that the bankrupt intended to deceive the plaintiff when he submitted the statement in question, it necessarily follows that the complaint will be dismissed.

### DISCUSSION

There is no question that a discharge in bankruptcy is a privilege granted to an honest debtor; *In re Robinson*, 506 F.2d 1184 [2 Cir. 1974] and that a debtor does not have a constitutional right to obtain a discharge of one's debts in bankruptcy. *United States v. Kras*, 409 U.S. 434, 93 S.Ct. 631, 34 L.Ed.2d 626 [1973].

Section 14c(3) of the Bankruptcy Act expressly bars a discharge to a bankrupt who, "while engaged in business . . . as an executive of a corporation, obtained for such business money or property on credit or as an extension or renewal of credit by making or publishing . . . a materially false statement in writing respecting his financial condition . . .".

Additionally, Section 17a(2) of the Bankruptcy Act excepts from discharge "liabilities for . . . obtaining money or property on credit . . . in reliance upon a materially false statement in writing respecting his financial condition made or published or caused to be made or published in any manner whatsoever with intent to deceive . . .".

Accordingly, since the bankrupt was an executive of his corporation and caused to be submitted the statement in question with respect to the plaintiff's furnishing of credit to such corporation it follows that if the statement was materially false and if the plaintiff advanced credit in reliance upon it, not only would the bankrupt's debt to the plaintiff be determined to be nondischargeable, but the bankrupt's discharge would be denied as well. In establishing these factors, the plaintiff has the burden of proving the facts essential to its case. Bankruptcy Rule 407.

This court has found that when the bankrupt submitted information to his accountants with respect to his assets he treated the task in the same fashion as he did when he submitted figures to them for the preparation of joint income tax return with his wife; he treated his jointly-owned home as an asset. That the title was held jointly with his wife was a matter of public record and could not be hidden from the plaintiff if it chose to question this item. The listing of the home on the so-called financial statement was ambiguous and does not of itself establish an intent to deceive. There was no extrinsic evidence of a fraudulent purpose; see *In re Adlman*, 541 F.2d 999 [2 Cir. 1976] and the bankrupt explained why he treated the house as an asset in the context of the statement. Although this was an error, it was not shown to have been accompanied by a fraudulent intent. "A financial statement which is merely erroneous but is not prepared with any intention to deceive, is not a false statement within the meaning of § 14c(3)." *In re Ostrer*, 393 F.2d 646, 649 [2 Cir. 1968]; 1 *Collier on Bankruptcy*, ¶ 14.40.

Moreover, the plaintiff failed to sustain its burden of proving that it reasonably relied on the financial statement; such reliance is an essential ingredient of the plaintiff's case. *Kentile Floors Inc. v. Winham*, 440 F.2d 1128 [9 Cir. 1971]. Unlike the statement submitted on behalf of the other shareholder the bankrupt's statement failed to reflect any liabilities other than the mortgage on the home in question. Net

worth could not be ascertained. It is inconceivable that an experienced commercial factor would place any weight on a statement that fails to reflect liabilities and where the question as to title to the most prominent asset is stated ambiguously. Significantly the plaintiff's own files contain documents which indicate that they relied on the bankrupt's personal guarantee and omit any reference to the so-called financial statement.

Manifestly, the patently incomplete statement as to the bankrupt's financial condition did not warrant the extension of any credit to his corporation until after the plaintiff was apprised as to his liabilities. It is inconceivable that a sophisticated financial institution would reasonably rely upon the statement in question. As was stated by the court in *Kentile Floors, Inc. v. Winham*, supra at page 1131:

> ". . . we agree with the district court that whatever reliance Kentile (the creditor) placed upon these statements was not a reasonable reliance, that Kentile therefore had no right to rely upon the statements in this situation."

See also, *In re Smith*, 424 F.Supp. 858 [M.D. La.1976].

That the plaintiff's witnesses testified that they relied upon financial statement [as distinguished from the bankrupt's guarantee which was mentioned in the supporting documents in the plaintiff's files] does not establish reasonable reliance when such reliance was clearly unreasonable. An unreasonable reliance is tantamount to no reliance. Reliance upon the ambiguous listing of a home without an investigation as to title on a document that does not purport to reflect liabilities other than a mortgage by a stranger with whom the plaintiff had no previous connection cannot be considered as reasonable in the circumstances.

## CONCLUSIONS OF LAW

1. The plaintiff has failed to sustain its burden of proof under either Sections 14c(3) or Section 17a(2) that the bankrupt obtained credit for his business by causing to be submitted to the plaintiff a materially false statement in writing respecting his financial condition.

2. The plaintiff failed to sustain its burden of proof that the bankrupt intended to deceive the plaintiff when he submitted the statement in question.

3. The plaintiff failed to sustain its burden of proof that it relied upon the statement in question when it extended credit to the bankrupt's business.

4. Having failed to sustain its burden of proof in this action, the plaintiff's complaint is dismissed.