**In the Matter of John Henry PATCH, IV, Debtor.**

**TELCO LEASING, INC., Appellant,**

v.

**John Henry PATCH, IV, Appellee.**

Civ. A. No. M–81–3042.

Bankruptcy No. 80–11368.

Adv. No. 81–0078.

United States District Court, D. Maryland.

Nov. 4, 1982.

Nelson C. Cohen, Chevy Chase, Md., for appellant.

Richmond T.P. Davis, Silver Spring, Md., for appellee.

MEMORANDUM AND ORDER

JAMES R. MILLER, Jr., District Judge.

Telco Leasing, Inc. (Telco) has appealed from the final order of the Bankruptcy Court[1] which declared Telco's judgment against the debtor, John Henry Patch, IV, to be dischargeable in bankruptcy. Both

---

**1.** Paper No. 37.

Telco[2] and Patch[3] have filed briefs, and the court concludes that no hearing is necessary. Local Bankruptcy Rule 57.

Telco commenced an adversary proceeding to determine the dischargeability of a debt owed to it by Patch, as established by a federal court judgment rendered in Illinois. According to Telco, the debt is nondischargeable under section 523(a)(2)(B) of the Bankruptcy Code, 11 U.S.C. § 523(a)(2)(B), which provides:

"(a) A discharge under section 727, 1141, or 1328(b) of this title does not discharge an individual debtor from any debt—

(2) for obtaining money, property, services, or an extension, renewal, or refinance of credit, by—

(B) use of a statement in writing—

(i) that is materially false;

(ii) respecting the debtor's or an insider's financial condition;

(iii) on which the creditor to whom the debtor is liable for obtaining such money, property, services, or credit *reasonably* relied; and

(iv) that the debtor caused to · be made or published with intent to deceive."

(Emphasis supplied).

The Bankruptcy Court held that Telco had carried its burden of proof with respect to all elements of section 523(a)(2)(B), except for the reasonableness requirement of clause (iii), concluding that while Telco had actually relied on Patch's false financial statement, such reliance was unreasonable under the circumstances.

## I. *Overview*

On February 13, 1979, Telco entered into an equipment lease agreement with P.H.S. Laboratories, Inc. (PHS). Prior to executing the agreement, and as a condition thereof, Telco required personal guarantees from four individuals associated with PHS, one of whom was Patch (Trial Ex. 1).

Ronald A. Hendrickson, then manager of Telco's operations (Tr. 9),[4] testified at the hearing that he was one of the two persons responsible for approving the lease with PHS, the other being George Contarsy (Tr. 10–11). Prior to receiving PHS's lease application, Hendrickson had never heard of PHS or Patch (Tr. 15–16).

Contarsy was presented with the PHS lease proposal by Hendrickson (Tr. 19) and then contacted Richard Huntley, president of PHS, to obtain information about the company, some of which was verified by Contarsy (Tr. 19). Huntley told Contarsy during their first telephone conversation that PHS was "a relatively new enterprise," and Contarsy was aware that Telco was "dealing with an entity in which there would be a high degree of risk." (Tr. 25). Because of such risk, Telco required the personal guarantes of Patch, Huntley, and two other individuals associated with PHS (Tr. 23).

Patch's financial statement (Trial Ex. 2) was submitted to Telco by PHS on behalf of Patch (Tr. 21, 26). According to Contarsy, Patch's financial statement was "a determining factor, a major determining factor in our going forward with the transaction." (Tr. 23). Nevertheless, Contarsy never spoke or met with Patch and had no knowledge of Patch's business or personal reputation (Tr. 24–25).

The financial statement at issue consists of three pages. The first page, which lists general information, is signed by Patch and is dated September 5, 1978. Pages two and three are in a format different from page one, and appear to be a separate form. Page three of the statement indicates that Patch is the beneficiary of an irrevocable trust, has $296,500 worth of preferred stock in a New York bank, and owns real property including one parcel purportedly worth $83,700 and identified as "27 Lakeshore Drive." At the foot of page three there is a

---

**2.** Paper No. 3.

**3.** Paper No. 6.

**4.** The transcript of the hearing before the Bankruptcy Court is docketed as Paper No. 5. All references to the record below are to transcript page·number.

certification clause, and space for a signature and date. Neither a signature nor a date, however, are affixed to the designated places on page three.

The bankruptcy judge found that at no time prior to the lease agreement did any officer of Telco communicate directly with Patch. The bankruptcy judge also found that Telco made *no* investigation into the veracity of the statements contained in Patch's financial statement regarding the trust or the bank stock. In the bankruptcy judge's view, Telco's reliance on Patch's financial statement was, under the circumstances, unreasonable.

## II. *Discussion*

As the party objecting to a discharge, Telco has the burden of proving all of the facts essential to its objection under Section 523(a)(2)(B). Bankruptcy Rule 407. *See, e.g., In re Dawson,* 16 B.R. 70, 73 (Bkrtcy.E. D.Va.1981); *In re Spangler,* 14 B.R. 598, 600 (Bkrtcy.W.D.Va.1981); 3 *Collier on Bankruptcy* ¶ 523.09 at 523–49 (15th ed. 1981). *See also Brown v. Buchanan,* 419 F.Supp. 199, 210 (E.D.Va.1975).

■ In reviewing a decision by a bankruptcy court, this court can set aside findings of fact only if they are clearly erroneous. Bankruptcy Rule 810. *See Melichar v. Ost,* 661 F.2d 300, 303 (4th Cir.1981); *In re Friedman,* 436 F.Supp. 234, 236 (D.Md. 1977). This court is not bound, however, by the Bankruptcy Court's conclusions of law. *See In re Multiponics,* 622 F.2d 709, 713 (5th Cir.1980); *In re Fett Roofing & Sheet Metal Co., Inc.,* 438 F.Supp. 726, 729 (E.D.Va. 1977), *aff'd,* 605 F.2d 1201 (4th Cir.1979).

Section 523(a)(2) of the Code is the successor to section 17a(2) of the Bankruptcy Act, 11 U.S.C. § 35(a)(2) (1976). In enacting the Code, Congress modified the statutory language of this provision by inserting the word "reasonably" before the word "relied," making it "explicit that the creditor must not only have relied on a false statement in writing, but the reliance must have been reasonable." 3 *Collier on Bankruptcy* ¶ 523.09[4] at 523–59 (15th ed. 1981).

In so doing, however, Congress apparently did not intend to add a new element to the creditor's burden in proving nondischargeability. The committee reports of both the House and the Senate state that the reasonableness requirement now made express in section 523(a)(2)(B) was a codification of the trend in the caselaw implying a reasonableness requirement under section 17a(2) of the Act. S.Rep.No.989, 95th Cong.2d Sess. 78 (1978), *reprinted in* [1978] U.S.Code Cong. & Ad.News 5787, 5864; H.R.Rep.No.595, 95th Cong. 1st Sess. 130–31, 364 (1977), *reprinted in* [1978] U.S.Code Cong. & Ad.News 5963, 6091–92, 6320. *See* 3 *Collier on Bankruptcy* ¶ 523.09[4] at 523–59 (15th ed. 1981).

Notwithstanding the legislative history of the Code, and the numerous Code [5] and Act [6] cases requiring the creditor's reliance on the false writing to be reasonable under the circumstances, Telco contends that it need show only reliance in fact. According to Telco, "courts should not get into an analysis at (sic) a lender's policy." [7] In support of its position, Telco relies on *In re Garman,* 625 F.2d 755 (7th Cir.1980), *cert. denied,* 450 U.S. 910, 101 S.Ct. 1347, 67 L.Ed.2d 333 (1981).[8]

In *Garman,* decided under section 17a(2) of the Act, a panel of the Seventh Circuit held that the "creditor need establish only its reliance in fact, although its claims to reliance cannot be so unreasonable as to

---

5. *See, e.g., In re Magnusson,* 14 B.R. 662, 668–69 & n. 1 (Bkrtcy.N.D.N.Y.1981); *In re Liberati,* 11 B.R. 54, 55 (Bkrtcy.E.D.Pa.1981); *In re Davidson,* 6 B.R. 159, 161–62 (Bkrtcy.M.D.Fla. 1980).

6. *See, e.g., Kentile Floors, Inc. v. Winham,* 440 F.2d 1128, 1131–32 (9th Cir.1971); *In re Danesi,* 6 B.R. 738, 740 (Bkrtcy.S.D.N.Y.1980), *aff'g,* 1 B.R. 234, 238–39 (Bkrtcy.S.D.N.Y.1979); *In re Smith,* 424 F.Supp. 858, 861–62 (M.D.La.1976);

*In re Adams,* 368 F.Supp. 80, 82–83 (D.S.D. 1973); *Sweet v. Ritter Finance Co.,* 263 F.Supp. 540, 544 (W.D.Va.1967); *In re Yeiser,* 2 B.R. 98, 100–02 (Bkrtcy.M.D.Tenn.1979).

7. Paper No. 3 at 5.

8. The *Garman* case was re-published at 643 F.2d 1252 to correct the designation of counsel.

defeat a finding of reliance in fact." 625 F.2d at 761. Whether *Garman* actually represents a standard different from that applied in other discharge cases, or is simply a semantic variation of an objective reasonableness standard tailored to the facts of that case, need not be determined here. *Garman* is distinguishable from this case in several significant respects.

Unlike Patch, the debtor in *Garman* was known personally by the creditor. Further, the debtor and creditor had a successful business relationship for some ten years prior to the default. In addition, all of the relevant financial statements were signed by the debtor. 625 F.2d at 756–67, 760.

Finally,[9] a close analysis of *Garman* reveals that a principal basis for the panel's decision was the lower courts' criticism of the creditor for looking to the debtor's net worth rather than his income flow. The court stated:

"The bankruptcy and district court judges' analyses of the present case, in fact, illustrate the very problems potentially arising from their interpretation of the above mentioned cases. Indeed, their analyses did not address whether the Northern's reliance *on the statements* was reasonable. Rather, they expressed their judgment on whether the decision *to loan Garman the money* was reasonable. They did not hold that the financial statements showing Garman's net worth in excess of the loaned amount was inherently unreliable; rather, they were concerned by the fact that the Northern would have based its decision to lend money on the net worth and nature of the assets of the debtor rather than the debtor's income. However, it is not the court's duty under § 17(a)(2) to second guess a creditor's decision to make a loan or to set loan policy for the creditor. If a lender chooses to let net worth rather than income be the determinative factor in loan decisions, it is not for the court to say that this is bad business policy requir-

ing discharge of the resulting debt in bankruptcy."

625 F.2d at 761 (emphasis in original) (footnotes omitted).

In light of the factual differences between this case and *Garman,* the reasoning employed by the Seventh Circuit panel is not dispositive of the present inquiry.

It is plain that the word "reasonable" is not self-defining, and can be employed meaningfully only with reference to a particular context. *See generally Black's Law Dictionary* 1431 (Rev. 4th ed. 1968). Consequently, courts construing the Act and the Code have employed a case-by-case approach to the reasonableness issue.

This court's review of the decided cases reveals three situations in which courts generally conclude that the creditor's reliance on the financial statement is unreasonable. The first type of situation is when the creditor knows at the outset that the information listed on the financial statement is not accurate. *See, e.g., Swint v. Robins Federal Credit Union,* 415 F.2d 179, 184 (5th Cir.1969); *In re Houk,* 17 B.R. 192, 195–96 (Bkrtcy.D.S.D.1982). A second type of situation is when the financial statement does not contain sufficient information to portray realistically the debtor's financial status. *See, e.g., In re Magnusson,* 14 B.R. 662, 668–69 & n. 1 (Bkrtcy.N.D.N.Y.1981). Finally, when the creditor's investigation suggests that the financial statement is false or incomplete, reliance thereon is held to be unreasonable. *See, e.g., In re Smith,* 2 B.R. 276, 279 (Bkrtcy.E.D.Va.1982).

A fourth and emerging view is that, under certain circumstances, the creditor's failure to verify any of the information contained in the financial statement renders reliance on that statement unreasonable. For example, *In re Breen,* 13 B.R. 965 (Bkrtcy.S.D.Ohio 1981), the debtor completed a financial statement listing, among other items, certain real property which was to be security for a loan to purchase a business. The financial statement did not re-

**9.** The Seventh Circuit panel ruled that the creditor's failure to verify the information contained in the financial statements was not un-

reasonable, in part, due to the parties' long financial association. 625 F.2d at 763.

veal a mortgage recently placed on the realty. The bankruptcy court found that the creditor did not check the debtor's credit rating, did not investigate the business to be purchased, and failed to ascertain the lien status of the realty. Noting that the creditor had access to all of this information but failed to make use thereof, the court held the creditor's reliance on the financial statement to be unreasonable. 13 B.R. 967–69. *Accord In re Ducote,* 4 Bkrtcy.Ct.Dec. 943, 945 (Bkrtcy.W.D.La.1978) (creditor failed to examine public land records); *In re Hodges,* 6 C.B.C. 65, 67–68 (Bkrtcy.S.D. Fla.1975) (same). *But cf. East Providence Credit Union v. Harpootian,* 108 R.I. 219, 273 A.2d 852, 855 (R.I.1971) (creditor not required to investigate whether debtor has any unlisted indebtedness).

■ Although the Code amended the Act's discharge language to include a statutory reasonableness requirement, Congress did not provide any definitional language. Accordingly, the courts must attempt to strike a balance between the legitimate, competing interests of creditors seeking to establish exceptions and debtors seeking discharge within the statutory framework. In so doing, the courts must first ascertain the congressional purposes underlying discharge and the false statement exception.

A principal purpose of the bankruptcy laws generally, and the discharge provisions in particular, is to provide the "honest but unfortunate" debtor with "a new opportunity in life and a clear field for future effort." *Brown v. Felson,* 442 U.S. 127, 128, 99 S.Ct. 2205, 2207, 60 L.Ed.2d 767 (1979), *quoting Local Loan Co. v. Hunt,* 292 U.S. 234, 244, 54 S.Ct. 695, 699, 78 L.Ed. 1230 (1934). Nevertheless, because exceptions to discharge prevent such a result they are construed liberally in favor of the debtor and strictly against the creditor. *See, e.g., Gleason v. Thew,* 236 U.S. 558, 562, 35 S.Ct. 287, 289, 59 L.Ed. 717 (1914); *Roberts v. W.P. Ford & Son, Inc.,* 169 F.2d 151, 152 (4th Cir.1948); *Johnston v. Johnston,* 63 F.2d 24, 26 (4th Cir.1933).

In discussing the Code's false statement exception, Professor Zaretsky has commented as follows:

"Since the purpose of the exception is to protect creditors who are actually misled by fraudulent statements of debtors, the requirement that reliance be reasonable is sensible. A creditor who ignores available information, or who fails to seek information from sources that are commonly used, should not be heard to complain about the debtor's fraud. It is the creditor's failing to comport with normal business practices, not the debtor's fraud, that is the true cause of the loss."

Zaretsky, The Fraud Exception to Discharge under the New Bankruptcy Code, 53 *Am.Bkrtcy.L.J.* 253, 262 (1979). *Cf. Appel v. Hupfield,* 198 Md. 374, 380, 84 A.2d 94 (1951) ("Representations of value are regarded as expressions of opinion which should put the person to whom they are made upon inquiry, and if he chooses to rely upon such statements and fails to make inquiry, he cannot maintain an action for deceit.").

It appears appropriate, therefore, that the reasonableness of a creditor's reliance on a financial statement should be judged by comparing the creditor's actual conduct with (1) the creditor's own normal business practices, and (2) the standards and customs of the industry, (3) in light of the surrounding circumstances existing at the time the application was made and credit extended.

An examination of the creditor's normal business practices is important for several reasons. For example, the creditor's failure to follow its own practices may be evidence of unreasonable conduct. Further, evidence of a creditor's normal practices would shed light on the character of its operation and allow for a comparison with industry standards.

The customs and practices of the industry should be examined because commercial lending practices are not static. As economic and social changes occur, the industry can be expected to act in a manner that will protect the financial integrity of its operations. As the false statement exception to discharge is of national application, the peculiar practices of a particular credi-

tor cannot be the sole benchmark for assessing the reasonableness of its reliance. In other words, a creditor cannot disregard industry custom and be held to have acted reasonably, if the following of standard practices would have provided the creditor with important information.

In this case, it is appropriate to focus on verification practices to determine, among other things, triggering events, the reasonable scope of any investigation, the sources of information, and the manner in which potentially "confidential" information is discovered.

The record in this case is such that the court cannot now make such determinations. Consequently, in accordance with Bankruptcy Rule 810, this case will be remanded to the Bankruptcy Court for further proceedings consistent with the considerations outlined above.

Accordingly, it is this 4th day of November, 1982, by the United States District Court for the District of Maryland, ORDERED:

1. The judgment of the Bankruptcy Court is VACATED.

2. This case is hereby REMANDED to the Bankruptcy Court for further proceedings consistent with this Memorandum and Order.

3. The Clerk shall transmit the record in this case to the Bankruptcy Court.

4. The Clerk shall close this case administratively, subject to the parties' right to reopen this case in accordance with Bankruptcy Rules 801 and 802.

5. The Clerk shall forward a copy of this Memorandum and Order to counsel for the parties.