**In the Matter of Scott N. SMITH and Deborah Smith, Debtors.**

**CHRYSLER CREDIT CORPORATION, Plaintiff,**

**v.**

**Scott N. SMITH, Defendant.**

**Bankruptcy No. 91–51018. Adv. No. 91–5079.**

United States Bankruptcy Court, M.D. Georgia, Macon Division.

July 29, 1992.

Cater C. Thompson, Macon, Ga., for plaintiff.

Danny L. Akin, Macon, Ga., for defendant.

J. Coleman Tidwell, Macon, Ga., Chapter 7 Trustee.

Jerome L. Kaplan, Macon, Ga., for debtor Scott N. Smith.

ROBERT F. HERSHNER, Jr., Chief Judge.

## STATEMENT OF THE CASE

Chrysler Credit Corporation, Plaintiff, filed a "Complaint to Determine Dischargeability of Debt" on June 17, 1991. Scott N. Smith, Defendant, filed his answer on July 16, 1991. Plaintiff filed an amendment to its complaint on February 11, 1992. Defendant filed an answer to the amended complaint on March 25, 1992. Plaintiff and Defendant filed a "Stipulation of Facts" on May 7, 1992. A trial was held on May 8, 1992. The Court, having considered the evidence presented and the arguments of counsel, now publishes this memorandum opinion.

## FINDINGS OF FACT

Barney A. Smith (hereinafter "Mr. Smith") is Defendant's father. Mr. Smith has been in the business of selling cars for a number of years. He has owned a number of new car and used car dealerships. Defendant worked for his father for about twelve years. He was general manager of his father's Chrysler dealership for six years. Mr. Smith promised that, at some time, the Chrysler dealership would be Defendant's. When Defendant turned thirty years old, Mr. Smith agreed to sell him the dealership.

Mr. Smith and Defendant executed a "Contract for Sale" in 1989.[1] The dealership sold was known as Barney A. Smith Chrysler, Plymouth, Dodge. The assets of the dealership had a fair market value of $600,468. Mr. Smith made a "gift" to Defendant of $100,468. The net price, therefore, was $500,000. Defendant agreed to pay his father $100,000 in cash at closing. This was to come from a capital loan provided by Plaintiff. The remaining $400,000 was to be paid to Mr. Smith in monthly

---

1. The copy of the contract presented at trial does not show the month and day that it was executed.

payments of $5,600 over ten years. This debt was secured by a second security interest on the assets of the dealership.[2] An unsigned copy of the sales contract was provided to Plaintiff.

Defendant executed an "Application for Dealer Agreement DAP-1" dated February 2, 1989. The dealership was to be known as Scott N. Smith Motors, Inc., d/b/a Scott N. Smith Chrysler–Plymouth–Dodge, Inc. (hereinafter "the dealership"). The dealership would sell Chrysler, Plymouth, and Dodge cars. The application shows that the dealership's assets included a used car inventory worth $150,000. A copy of the application was given to Plaintiff. The information on this application was used by Plaintiff in extending credit to Defendant.

R.M. Cady, Plaintiff's branch manager, sent a memorandum dated February 8, 1989, to Plaintiff's area credit manager. The memorandum states that an agreement had been reached to provide Defendant with a $400,000 capital loan, a $1.2 million new car line of credit, and a $500,-000 used car line of credit. The memorandum stated the net worth of the dealership's assets was $600,000 and that Mr. Smith was making a $100,000 gift to Defendant. The memorandum notes that Defendant would continue to operate his father's business, which had been successful. Mr. Cady recommended that Plaintiff approve this agreement.

Plaintiff and Defendant, as president of the dealership, executed a wholesale floor plan agreement dated March 1, 1989. Plaintiff agreed to floor plan 100 percent of the wholesale cost of new cars purchased from the Chrysler Corporation. Plaintiff was to receive a first security interest in all such new cars and in the proceeds. The dealership agreed to hold, in trust, the proceeds from the sales. The dealership agreed to send payment to Plaintiff within ten days after a car was sold to a customer. Mr. Smith executed a personal guaranty of the floor plan agreement. He was

released from this guaranty after the dealership had operated successfully for a few months.

Plaintiff and Defendant, as president of the dealership, executed a capital loan agreement dated April 28, 1989. The funds were to be used as working capital. Plaintiff received a security interest in virtually all assets and proceeds of the dealership. Mr. Smith executed a personal guaranty of this obligation. He remains liable on this guaranty.

William H. Crawford, Plaintiff's branch operations supervisor, testified that Plaintiff's policy was to extend capital loans for seventy-five percent of a dealership's net worth. Mr. Crawford testified that "we wanted this account." Plaintiff, therefore, agreed to loan eighty percent of the dealership's net worth of $500,000. Thus, the capital loan amount was $400,000. Apparently, $100,000 of this amount was to be paid to Mr. Smith. Mr. Crawford did not know if that amount actually was paid to Mr. Smith. If the documents given to Plaintiff had not shown a used car inventory worth $150,000, then the capital loan limit would have been $280,000. Mr. Crawford does not know if that "deal would have worked." The dealership had no cash, and its principal assets were the used cars and accounts receivable.

Defendant executed a personal guaranty of the floor plan agreement and the capital loan agreement.[3] The floor plan agreement and the capital loan agreement contain provisions for the payment of reasonable attorney's fees if the obligations are collected by or through an attorney.

Plaintiff had provided retail floor planning for Mr. Smith's business. Mr. Smith's guaranties and backing were needed "to make the deal work" between Plaintiff and Defendant. Mr. Smith's involvement was a significant consideration in Plaintiff's decision to enter into the agreements with Defendant. Mr. Crawford testified that "Barney's [Smith] word made the deal." Mr.

---

**2.** Plaintiff acquired the first security interest on the assets of the dealership.

**3.** Defendant's wife also executed the personal guaranty and is a codebtor in this bankruptcy case. She is not a defendant in this adversary proceeding.

Smith was not involved in Defendant's dealership except for his personal guaranties.

The dealership began operating in March of 1989. It was successful during the first six or seven months. About eighty cars were being sold each month. The dealership was able to make its monthly payments of $5,600 to Mr. Smith. Payments were made to Plaintiff on the capital loan agreement and on the floor plan agreement. Defendant was personally responsible for the day-to-day operations of the dealership.

During the latter part of 1989, Plaintiff arranged for the dealership to purchase several "conversion vans" from a Chrysler dealer that had closed. A conversion van is a van that has been modified with special seats, interiors, and equipment. Later on, Plaintiff agreed to floor plan the purchase price of vans that the dealership purchased from the Chrysler Corporation. Plaintiff also agreed to floor plan the conversion cost. Two conversion companies offered an "incentive program." These companies refunded a portion of the conversion cost to Defendant personally. In 1990, Defendant received $86,370 in refunds. These refunds were not disclosed to Plaintiff. Mr. Crawford testified that he knew that some companies gave refunds. Mr. Crawford testified that Defendant told him that he was not padding the conversion van invoices with kickbacks. Mr. Crawford testified that if Plaintiff had known of the refunds, Plaintiff would have floor planned only the net conversion cost or would have cancelled the conversion van agreement. The conversion van agreement between Plaintiff and Defendant was not presented at trial.

The dealership began having financial problems during the first months of 1990. The dealership was located in a city that has a large military population. Many of the military personnel were transferred to other locations. In addition, general economic conditions caused a significant decline in sales. The car inventory, however, had increased to about $3 million. The floor plan agreement was for $1.7 million in inventory.

Carol Lumley was the bookkeeper and office manager during the entire time the dealership was in business. She testified that a check payable to Plaintiff was written each time a car was sold. The check was not dated or mailed, however, until funds were available to pay the check. During the summer of 1990, the dealership could not make its payment timely to Plaintiff. Ms. Lumley met with Defendant every day concerning the payments. When the dealership closed, there were checks totalling $303,457 that had not been mailed to Plaintiff. Ms. Lumley voided these checks and "just started over" with her bookkeeping entries.

Ms. Lumley telephoned Mr. Crawford from her home after the dealership began having problems in 1990. She told Mr. Crawford that she did not agree with things that were going on at the dealership and that she was worried about Defendant. She denied that cars were being sold out of trust. She did not give specific details about the dealership's problems. Ms. Lumley wanted Mr. Crawford to talk to Defendant and to help get the dealership straightened out. She expressed concern that the dealership had too much inventory. Mr. Crawford testified that he did not understand why Ms. Lumley called. Mr. Crawford discussed the conversation with Plaintiff's branch manager. They did not believe anything needed to be done. The relationship between the dealership and Plaintiff did not change after Ms. Lumley's phone call.

Plaintiff conducted a field audit of the dealership's car inventory each month. Defendant knew when Plaintiff's representative was coming. Plaintiff's representative was supposed to see each car and check the original "Manufacturers Statement of Origin" (MSO). The purpose was to prevent a dealer from selling a car and not paying Plaintiff. This is referred to as "selling out of trust." If a car could not be located, the dealership was supposed to issue a check "on the spot." Plaintiff's representatives were lax, and the dealership had ways to cover up a missing car. Ms. Lumley testified that Defendant told her how to

handle these situations. Ms. Lumley would tell Plaintiff's representative that a customer was test-driving a car or trying to obtain a loan, or that a salesman, who was not working that day, had the car.

Ms. Lumley would divert the attention of Plaintiff's representative and later give the representative a photocopy of the MSO. The representative would accept the photocopy even though this clearly was against Plaintiff's policy. The dealership file cabinets were in plain sight and accessible. Ms. Lumley made sure that a missing car was paid for before the next monthly audit. Thus, a car was never missing two consecutive months. Ms. Lumley testified that she did not have to "trick" Plaintiff's representative into taking the photocopy. That is, the representative readily took the photocopy. Plaintiff did not send the same representative to the dealership each month. This made it easier for Ms. Lumley to cover up a missing car.

Sometimes a conversion van was missing. Plaintiff's representative would be told that the van was at a conversion company. The representative would call the conversion company and would be told that the van was there. The dealership represented to Plaintiff that the van had been sent to be converted. In some cases, however, the dealership had sold the van to the conversion company.

The contract for sale, dealer application, and dealer financial statements provided to Plaintiff showed that the dealership had a $150,000 used car inventory when Defendant purchased the dealership from his father. Those cars, however, were not transferred to the dealership. Mr. Smith testified that Defendant "was never too high on used cars like I was." He testified that Defendant could have picked up the used cars if he needed them. Mr. Smith testified that Defendant wanted to leave the used cars at Mr. Smith's business and apply them against the debt owed to Mr. Smith. Mr. Smith would not have given Defendant the used cars after the dealership defaulted on its monthly payments. A used car inventory worth $150,000 would represent about ten to fifteen cars. Mr.

Crawford testified that he did not remember seeing any used cars on Defendant's lot when the sale between Defendant and Mr. Smith closed. He understood, however, that the cars would be supplied by Mr. Smith.

The dealership sent Plaintiff a "Dealer Financial Statement" each month. The statement showed the financial condition, floor plan liability, and inventory of new and used cars. Ms. Lumley testified that the information provided was correct except that it included the used cars that were not transferred to the dealership by Mr. Smith. The statements were reviewed by Plaintiff's sales representative. Statements prior to November 1989 were reviewed by Mr. Crawford. The November 1989 and subsequent statements were reviewed by Leanne Jackson. Based on the dealer's financial statement, Plaintiff's sales representative completed a "Dealer Financial Statement Analysis," which showed whether the dealership was profitable and whether there were any adverse trends and major changes in assets, liabilities, and net worth. Statements and analyses for eleven months between August of 1989 and September of 1990 were admitted into evidence. Each analysis showed that the dealership was profitable and there were no adverse trends or major changes.

The dealership made monthly payments to Mr. Smith until July or August of 1990. After the dealership defaulted, Mr. Smith asked Defendant where his payments were, and Defendant stated he was running short. After a discussion, Defendant and his father determined that another capital loan was needed. Mr. Smith advised Defendant that they needed to talk with representatives of Plaintiff. A call was placed to Plaintiff, asking for a meeting. Defendant asked what a loan application would involve. Mr. Crawford told Defendant that an audit would be done. Defendant told Mr. Crawford about the missing used cars. He told Mr. Crawford that the used car inventory was included to satisfy Plaintiff's requirements for the capital loan. Defendant told Mr. Crawford that he had a cash flow problem, which is commonly called

"cash float." A cash float is the time between the date a car is sold and the date the dealer actually receives the customer's money (for example, the time necessary for the customer's check to clear the bank). A cash float affects the ability to pay a floor plan, so the dealer needs other cash to make payments.

Ms. Jackson did a "bank cut off" after Defendant applied for the capital loan. A bank cut off involves an inventory audit, checkbook balance, bank account analysis, verification and aging of accounts receivable. The purpose of a bank cut off is to verify a dealership's equity. None of Defendant's dealership records were changed or hidden for this audit. Ms. Jackson found the used car equity was not as stated. She instructed Ms. Lumley to remove the missing used car inventory of $150,000 from the dealership's books. This was done about one month later. Mr. Crawford testified that Plaintiff did not change the floor plan agreement because the dealership had some equity and was paying its bills.

Defendant, Mr. Smith, Mr. Crawford, Ms. Jackson, and Mr. Cady met at Plaintiff's Macon office in September of 1990. The original capital loan principal of $400,000 had been paid down. Defendant wanted to borrow additional funds to again raise the principal to $400,000. Mr. Smith acknowledged the missing used cars. The issue of whether the dealership was selling cars out of trust was not discussed.

Mr. Crawford sent information on Defendant's capital loan request to Plaintiff's Atlanta office. Plaintiff's Macon office recommended that Defendant's request be approved if Mr. Smith would again personally guaranty all the dealership's obligations. Mr. Smith declined to execute any such guaranties. The Atlanta office sent a memo dated October 18, 1990, stating it would not approve Defendant's request as submitted. The Atlanta office also wanted "a full home office audit." This audit was scheduled for December of 1990. The dealership closed before this audit was done.

Defendant closed the dealership on November 13, 1990. Ms. Jackson and Plaintiff's branch manager conducted an audit of the cars on the dealership's lot that afternoon. There were thirty-two cars that were missing. This included twenty-seven new cars and five used cars. The dealership had not paid Plaintiff for these cars. Eight cars had been sold prior to Plaintiff's last audit on October 24, 1990. Twenty cars were sold after Plaintiff's last audit. Four cars were given to two creditors during the last four days of the dealership's operation in satisfaction of indebtedness.

Mr. Crawford testified that he did not know that the dealership was selling cars out of trust until after the dealership closed. He testified that Plaintiff would have cancelled the lines of credit and taken over the dealership if it had known that Defendant was out of trust. Mr. Crawford testified that Plaintiff expected to lose money on car inventory anytime a dealership closed. No checks were written to Plaintiff after November 7, 1990. Some cars were sold after that date. The dealership paid other creditors by check after that date.

After the dealership closed, Defendant and Ms. Lumley met with Ms. Jackson and other representatives of Plaintiff. Defendant told Plaintiff's representatives how the dealership had gotten into trouble and how he prevented Plaintiff from finding out that cars were being sold out of trust.

After the dealership closed, Defendant and his father talked with several banks, trying to obtain financing to reopen the business. These efforts continued until January of 1991. Defendant filed a petition under Chapter 7 of the Bankruptcy Code on March 20, 1991, after he defaulted on his home mortgage.

The parties stipulate that Defendant and the dealership are indebted to Plaintiff in the following amounts:

Capital Loan

| | | |
|---|---|---|
| Principal | $280,000.12 | |
| Interest (10/1/90—3/31/92 at $92.0548 per diem) | 49,744.82 | |
| | | $329,744.94 |

Wholesale

| | | |
|---|---|---|
| Inventory sold out of trust[4] | | |
|     Net Principal | $461,744.54 | |
|     Interest (6/1/91—3/31/92 at $123.3472 per diem) | 37,497.55 | |
| | $499,242.09 | |
| | | |
| Inventory other than sold out of trust[5] | $190,013.73 | |
|     Interest (6/1/91—3/31/92 at $50.7571 per diem) | 14,821.07 | |
| | $204,834.80 | |
| | | |
| Wholesale Charges[6] | $178,526.26 | |
| | | $882,603.15 |
| Credits | | [$ 5,832.11] |
| | Total | $1,206,515.98 |

---

## CONCLUSIONS OF LAW

Plaintiff asks the Court to find that part of Defendant's debt is nondischargeable under section 523(a)(2)(A) and (B), (a)(4) and (6) of the Bankruptcy Code.[7] The section provides:

(a) A discharge under section 727, 1141[,] 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—

. . . .

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;

(B) use of a statement in writing—

(i) that is materially false;

(ii) respecting the debtor's or an insider's financial condition;

(iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied;

(iv) that the debtor caused to be made or published with intent to deceive; or

. . . .

(4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny;

. . . .

(6) for willful and malicious injury by the debtor to another entity or to the property of another entity;

11 U.S.C.A. § 523(a)(2)(A) and (B), (a)(4), and (6) (West 1979 & Supp.1992).

Plaintiff bears the burden of proving the nondischargeability of the debt by a preponderance of the evidence. *Grogan v. Garner,* —— U.S. ——, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).

At trial, some legal theories asserted by Plaintiff's counsel differed from those asserted in Plaintiff's complaint and amended complaint. Counsel for Defendant did not object. These differences do not affect the Court's decision.

**4.** This represents the thirty-two cars that were sold out of trust.

**5.** This represents cars that were on the dealership lot when the business closed. Plaintiff sold these cars at a loss.

**6.** The stipulation does not state what these charges represent.

**7.** 11 U.S.C.A. § 523(a)(2)(A) and (B), (a)(4), and (6) (West 1979 & Supp.1992).

Plaintiff contends that Defendant caused willful and malicious injury when the cars were sold out of trust shortly before the dealership closed. In *Eaves v. Hampel (In re Hampel)*,[8] this Court stated:

> In order to except from discharge an individual's debt under section 523(a)(6), the party seeking the exception must prove the willfulness and maliciousness of the act from which the debt arose.... Willful means intentional or deliberate and cannot be established merely by applying a recklessness standard. *Lee v. Ikner (In re Ikner)*, 883 F.2d 986, 989 (11th Cir.1989); *Chrysler Credit Corp. v. Rebhan*, 842 F.2d 1257, 1262–63 (11th Cir.1988).
>
> Malicious means wrongful and without just cause or excessive even in the absence of personal hatred, spite, or ill will. Malice can be established by a finding of implied or constructive malice. Special malice, a specific intent to harm another, need not be proven. Constructive or implied malice can be found if the nature of the act itself implies a sufficient degree of malice. *In re Ikner*, 883 F.2d at 991.
>
> An act of reckless disregard of the rights of others is insufficient to constitute willful and malicious conduct. *American Cast Iron Pipe Co. v. Wrenn (In re Wrenn)*, 791 F.2d 1542, 1544 (11th Cir.1986).
>
> Exceptions to dischargeability are to be construed strictly. *Schweig v. Hunter (In re Hunter)*, 780 F.2d 1577, 1579 (11th Cir.1986). The exceptions to discharge were not intended and must not be allowed to swallow the general rule favoring discharge. *Murphy & Robinson Investment Co. v. Cross (In re Cross)*, 666 F.2d 873, 880 (5th Cir. Unit B 1982).

110 B.R. at 91.

In *Chrysler Credit Corp. v. Rebhan*,[9] the debtor and his brother operated a car dealership. Chrysler Credit provided a capital loan and floor planning. Chrysler Credit held perfected security interests in each car and the proceeds. The debtor executed personal guaranties. Twelve cars were sold out of trust before the dealership closed. The bankruptcy court found that the debtor had received some of the converted sales proceeds from the cars sold out of trust.[10]

In that case, the bankruptcy court stated:[11]

> Under Section 523(a)(6) of the Bankruptcy Code, when a debtor injures a creditor by converting his property, the debt is nondischargeable in bankruptcy if the conversion was "willful and malicious." *In re Simmons*, 9 B.R. 62 (Bkrtcy.S.D.FLA.1981); 2 *Collier on Bankruptcy*, ¶ 53.16[3] n. 35 (15th Ed. 1984).... "[T]he sale of property subject to a security interest by a debtor without payment of the debt so secured is a willful and malicious conversion. *In re Goddaeus*, 1 C.B.C. 105 (W.D.Mich. 1974)." *Matter of Auvenshine*, 9 B.R. 772, 775 (Bkrtcy.W.D.Mich.1981).

45 B.R. at 611–12.

The bankruptcy court found the debt created by selling cars out of trust nondischargeable under section 523(a)(6). *In re Rebhan*, 45 B.R. at 613. The Eleventh Circuit Court of Appeals affirmed the bankruptcy court's decision. *Chrysler Credit Corp. v. Rebhan*, 842 F.2d at 1264.

In the case at bar, the dealership sold cars out of trust when it was in financial trouble. Plaintiff had a first security interest in the cars and the proceeds. Defendant had agreed to send payment to Plaintiff within ten days after a car was sold to the customer. Several cars were sold after Defendant learned that Plaintiff had denied his request for an additional capital loan. The dealership continued to pay other creditors after it had stopped paying Plaintiff. Defendant knew or should have known that the dealership would not be able to

---

**8.** 110 B.R. 88 (Bankr.M.D.Ga.1990).

**9.** 842 F.2d 1257 (11th Cir.1988).

**10.** *Id.* at 1258–60.

**11.** *Chrysler Credit v. Rebhan (In re Rebhan)*, 45 B.R. 609 (Bankr.S.D.Fla.1985), *aff'd,* 842 F.2d 1257 (11th Cir.1988).

pay Plaintiff. Defendant was responsible for the day-to-day operations of the dealership. Defendant executed personal guaranties of the dealership's obligations. Plaintiff and Defendant stipulate that the net loss on these cars was $461,744.54, plus interest. The Court is persuaded that this debt is nondischargeable under section 523(a)(6). The Court, therefore, does not reach other theories for recovery advanced by Plaintiff.

■ Plaintiff contends that Defendant obtained financing through false pretenses, false representations and actual fraud, and by use of false financial statements. Plaintiff contends that it would not have provided financing if the dealership's financial statements had not contained the used car inventory. Plaintiff contends that the entire debt of $1,206,516 is nondischargeable.

In *Schweig v. Hunter (In re Hunter)*,[12] the Eleventh Circuit Court of Appeals stated:

> In order to preclude the discharge of a particular debt because of a debtor's false representation, a creditor must prove that: the debtor made a false representation with the purpose and intention of deceiving the creditor; the creditor relied on such representation; his reliance was reasonably founded; and the creditor sustained a loss as a result of the representation. The debtor must be guilty of positive fraud, or fraud in fact, involving moral turpitude or intentional wrong, and not implied fraud, or fraud in law, which may exist without the imputation of bad faith or immorality.

780 F.2d at 1579.

"[R]eckless disregard for the truth or falsity of a statement constitutes a 'false representation' under § 523(a)(2)(A) of the Bankruptcy Code." *Birmingham Trust National Bank v. Case*, 755 F.2d 1474, 1476 (11th Cir.1985).

In *Sears, Roebuck & Co. v. Faulk (In re Faulk)*,[13] the bankruptcy court stated:

A "false pretense" involves implied misrepresentation or conduct intended to create and foster a false impression, as distinguished from a "false representation" which is an express misrepresentation. *Matter of Weinstein*, [31 B.R. 804 (Bankr.E.D.N.Y.1983)], *Id.* at 809.

69 B.R. at 750.

Defendant executed a contract for sale and a dealership application that listed a used car inventory of $150,000. Defendant never obtained these used cars. The used car inventory was shown on the dealership's monthly reports sent to Plaintiff. The dealership's capital loan limit was based, in part, on the value of the used cars. Defendant told Mr. Crawford that the used car inventory was included to satisfy Plaintiff's requirements for the capital loan. Plaintiff's security interest would have attached to the used cars and the proceeds. The Court is persuaded that Defendant deceived Plaintiff.

■ Plaintiff must have relied on Defendant's representations, and that reliance must be reasonable. *In re Hunter*, 780 F.2d at 1579 (creditor must prove that it relied on debtor's false representations and that its reliance was reasonable).

In *Massey–Ferguson Credit Corp. v. Archer (In re Archer)*,[14] this Court stated:

A question remains of whether Plaintiff's reliance was reasonable. "It is plan that the word 'reasonable' is not self-defining, and can be employed meaningfully only with reference to a particular context.... Consequently, courts construing the Act and the Code have employed a case-by-case approach to the reasonableness issue." *Telco Leasing, Inc. v. Patch (In re Patch)*, 24 B.R. 563, 566 (D.Md.1982) (citations omitted).

55 B.R. at 178.

In *Telco Leasing, Inc. v. Patch (In re Patch)*,[15] the court stated:

It appears appropriate, therefore, that the reasonableness of a creditor's re-

**12.** 780 F.2d 1577 (11th Cir.1986).

**13.** 69 B.R. 743 (Bankr.N.D.Ind.1986).

**14.** 55 B.R. 174 (Bankr.M.D.Ga.1985).

**15.** 24 B.R. 563 (D.Md.1982).

liance on a financial statement should be judged by comparing the creditor's actual conduct with (1) the creditor's own normal business practices, and (2) the standards and customs of the industry, (3) in light of the surrounding circumstances existing at the time the application was made and credit extended.

An examination of the creditor's normal business practices is important for several reasons. For example, the creditor's failure to follow its own practices may be evidence of unreasonable conduct. Further, evidence of a creditor's normal practices would shed light on the character of its operation and allow for a comparison with industry standards.

The customs and practices of the industry should be examined because commercial lending practices are not static. As economic and social changes occur, the industry can be expected to act in a manner that will protect the financial integrity of its operations. As the false statement exception to discharge is of national application, the peculiar practices of a particular creditor cannot be the sole benchmark for assessing the reasonableness of its reliance. In other words, a creditor cannot disregard industry custom and be held to have acted reasonably, if the following of standard practices would have provided the creditor with important information.

24 B.R. at 567–68.

Plaintiff did not verify that the used cars were transferred to the dealership. Mr. Crawford testified that he did not remember seeing any used cars on Defendant's lot when the sale between Defendant and Mr. Smith closed. Mr. Smith's personal guaranties and backing were a significant consideration in Plaintiff's decision to provide financing to Defendant. Mr. Cady, in his memorandum to Plaintiff's area credit manager, stated Defendant would continue to operate his father's business, which had been successful. The Court is not persuaded that Plaintiff relied on Defendant's representation as to the $150,000 used car inventory or that, if Plaintiff relied, it was reasonable. The Court must find from the evidence presented that Plaintiff has not carried its burden on this issue.

■ Defendant personally received $86,370 in refunds from the conversion van companies. Plaintiff contends this amount should be nondischargeable under section 523(a)(2) and (4). The refunds were not disclosed to Plaintiff. Mr. Crawford testified that Defendant stated he was not padding the conversion van invoices with kickbacks. Mr. Crawford knew that some companies gave refunds. The agreement between Plaintiff and Defendant concerning the conversion vans was not presented at trial. The Court is not persuaded that Defendant was obligated to disclose these refunds to Plaintiff. The Court is not persuaded that Defendant deceived Plaintiff on the refunds. The Court is persuaded that Defendant was entitled to the refunds from the conversion van companies. Thus, Defendant did not embezzle funds belonging to Plaintiff. The Court is not persuaded that Plaintiff has carried its burden on this issue.

■ Plaintiff asks the Court to award reasonable attorney's fees as provided for in the capital loan agreement, the floor plan agreement, and Defendant's personal guaranty. *Transouth Financial Corp. of Florida v. Johnson,* 931 F.2d 1505, 1509 (11th Cir.1991) (creditor successful in dischargeability proceeding may recover its attorney's fees as part of nondischargeable debt when such fees are provided for by enforceable contract between parties).

"The filing of a petition for reorganization under Chapter XII of the Bankruptcy Act does not diminish the debtor's obligation for attorney fees if vested when the petition is filed." *Mills v. East Side Investors (In re East Side Investors),* 702 F.2d 214, 215 (11th Cir.1983).

Georgia Code section 13–1–11(a) [16] provides that an obligation to pay attorney's fees "upon any note or other evidence of indebtedness ... shall be valid and enforceable and collectable" if certain conditions are met. The creditor must send the debtor a "10–day letter" giving notice of its

---

**16.** O.C.G.A. § 13–1–11(a) (1982).

intent to enforce the attorney's fees provision. In the case at bar, Plaintiff failed to show at trial that the ten-day letter was sent. Plaintiff has failed to show that its right to attorney's fees was vested when the bankruptcy case was filed. *See Anderson v. First National Bank of Cobb County (In re Anderson)*, 28 B.R. 231, 233 (Bankr.N.D.Ga.1983). The Court, therefore, will not award attorney's fees.

An order in accordance with this memorandum opinion will be entered this date.

### ORDER

In accordance with the memorandum opinion entered this date; it is

ORDERED, ADJUDGED, AND DECREED that the debt owed by Scott N. Smith, Defendant, to Chrysler Credit Corporation, Plaintiff, in the amount of $461,-744.54 hereby is determined to be nondischargeable in bankruptcy; and it is further

ORDERED that Defendant hereby is discharged from all other obligations to Plaintiff; and it is further

ORDERED that Plaintiff have judgment against Defendant in the principal amount of $461,744.54; and it is further

ORDERED that the request by Plaintiff for an award of attorney's fees hereby is denied.

SO ORDERED.