In the Matter of Terry HOLT and Nancy Holt, Debtors.

Harley FINCHER and Tammy Fincher, Plaintiffs,

v.

Terry HOLT, Defendant.

Bankruptcy No. 93–30558 RFH.
Adv. No. 93–3037.

United States Bankruptcy Court, M.D. Georgia, Athens Division.

Oct. 25, 1994.

William Woods White, Atlanta, GA, for plaintiffs.

Don M. Jones, Loganville, GA, for defendant.

William M. Flatau, Macon, GA.

## MEMORANDUM OPINION

ROBERT F. HERSHNER, Jr., Chief Judge.

Harley Fincher and Tammy Fincher, Plaintiffs, filed on September 14, 1993, a "Complaint to Determine Dischargeability of Debt and Objection to Discharge of Debtor Terry Holt." Terry Holt, Defendant, filed an answer on October 27, 1993. Plaintiffs filed an amendment to their complaint on July 22, 1994.[1] A trial was held on July 26, 1994. The Court, having considered the evidence presented and the arguments of counsel, now publishes this memorandum opinion.

## FINDINGS OF FACT

In July of 1991, Plaintiffs were living in Lawrenceville, Gwinnett County, Georgia. Plaintiffs had agreed to vacate their residence. Plaintiffs wanted to move to Walton County, Georgia. Plaintiffs saw an advertisement in a store window for Defendant's business, K & H Log Homes.

Defendant was developing a subdivision in Walton County known as Springhill Subdivision. The land was owned by Dr. Stephen Kutner, who provided the financing for the subdivision. Plaintiffs contacted Defendant, who showed them a model log home he had built in the Springhill Subdivision. Plaintiffs had never met Defendant before this contact. Defendant represented that his log homes would qualify for the Walton County EMC "good cents" program and would meet applicable building regulations. Defendant represented that Plaintiffs would receive a monetary rebate if a heat pump was installed in their log home. The model log home had double-paned windows. Defendant talked about prices of log homes and lots in the subdivision. Defendant was building, in Springhill Subdivision, a log home for his family and one for Alison Brickman.

Defendant gave Plaintiffs a brochure on log homes published by the Sisson Company. The brochure contained a description of standard building materials and specifications. The Sisson Company supplies the logs and related materials to a builder. The builder cuts the logs to the appropriate lengths and assembles the log home.

Plaintiffs selected a house plan known as Hidden Lake, which is a two-story log home with a vaulted ceiling. The second story is a loft and two bedrooms. Plaintiffs understood the log home would have double-paned windows. Plaintiffs made a few changes in the

1. Defendant did not object to Plaintiffs' amendment or when Plaintiffs asserted the amended cause of action at trial. The Court is persuaded that the amended cause of action was tried by consent of the parties. See Fed.R.Bankr.P. 7015, Fed.R.Civ.P. 15.

house plans. Plaintiffs testified an additional room was built without charge.[2]

Defendant knew that Plaintiffs needed to move into their log home as soon as possible. Mrs. Fincher was six months pregnant, and Plaintiffs had agreed to vacate their Lawrenceville residence. Defendant told Plaintiffs that their log home could be completed in about thirty days, even though Defendant had never completed a two-story log home within that time.

Plaintiffs and Defendant did not sign a sales or construction contract. The closing on Plaintiffs' log home was held on August 6, 1991. Mr. Fincher made a $5,000 down payment. Defendant had given Mr. Fincher a check for $2,000, which was used as part of the down payment. Mr. Fincher repaid Defendant with funds from Mr. Fincher's parents. Defendant received $60,000 to construct the log home. Defendant began construction about one week after the closing. Mr. Fincher had injured his knee and was unable to work during the construction period. He visited the construction site almost daily.

The actual construction of Plaintiffs' log home was performed by subcontractors hired by Defendant. Defendant did little of the actual work. Defendant visited the work site a number of times during the construction. Warren Efferson supervised some of the workmen. Defendant's brother, Glen Holt, assembled the walls and put in the floor system. The roof was put on by the Sisson Company. The shingles were put on by Defendant's crew.

Plaintiffs' log home was not completed within thirty days. Defendant testified that the delay was caused by rainy weather, delays in obtaining materials, and other construction problems. Plaintiffs had to vacate their Lawrenceville residence. Mr. Fincher was still unable to work, and Mrs. Fincher was near the due date of her pregnancy. Plaintiffs lived with Mrs. Fincher's parents for about two weeks. Plaintiffs then lived in apartments until their savings were exhausted. Plaintiffs' son, Andrew, was born on October 8, 1991.

Defendant suggested that Plaintiffs move into his log home in the Springhill Subdivision. Plaintiffs were not financially able to refuse. Plaintiffs agreed to this suggestion, believing that this would force Defendant to complete their log home. Plaintiffs' son, Andrew, was about two weeks old when they moved in with Defendant's family. Plaintiffs lived with Defendant for two or three weeks. Plaintiffs were not charged any rent.

The two families got along well until Defendant learned that Plaintiffs had consulted an attorney about suing Defendant because their log home had not been completed. Plaintiffs and Defendant had an argument and Plaintiffs moved into the unfinished log home.[3] The actual move occurred on the day before Thanksgiving of 1991.[4] The heat pump was not installed until the day after Thanksgiving. Defendant testified that he spent more than $60,000 building Plaintiffs' log home. Defendant's wife, Nancy Holt, handled the books for Defendant's business. Mrs. Holt testified that more than $70,000 was spent building Plaintiffs' log home.

Plaintiffs soon discovered a number of problems with their log home. Defendant admits that it is the worst home he has ever built. Plaintiffs' witnesses[5] testified that this is the worst built home they have ever seen. It is clear that the log home was not built in a workmanship like manner. The log home has substantial air and water infiltration because of gaps between its logs. The walls have been damaged and stained because of water leaks. Not enough nails were used in some places. Some shingles have turned up and flop in the wind. The roof has poor ventilation. Rain pours through the electrical receptacles and switches. The heat

---

**2.** After Plaintiffs moved into the log home, Defendant's wife presented a bill for the additional room, which Plaintiffs refused to pay.

**3.** A certificate of occupancy for Plaintiffs' log home was issued by Walton County on November 22, 1991, even though the log home had not been finished.

**4.** This date was November 27, 1991.

**5.** One witness was a home builder who lives in a log home. The second witness was a private home inspector.

pump was not large enough. The service wire for the heat pump was too small. This was a potential fire hazard, which Plaintiffs corrected at their expense. The chimney and fireplace are not properly sealed and have suffered water damage. The walkway between the second story bedrooms was not properly anchored.

A number of logs were installed improperly. This may reduce how long the logs last. The windows are single pane and do not have metal flashing. Rain comes in around the windows. Insects have entered the log home through gaps in the logs. The log home does not comply with standard building codes. These defects should have been noticed by any builder. Mr. Fincher testified that Defendant ordered the workmen not to use so much foam sealer between the logs. Mr. Fincher also testified that Defendant refused to purchase a new saw blade which was needed to cut the logs. This may have caused some of the gaps between the logs.

Plaintiffs' witnesses testified that the only reasonable way to fix the log home is to tear it down and build another residence. Defendant's witnesses testified that the log home can be fixed. Defendant has failed to fix the problems, even though he has been given a number of opportunities.

Plaintiffs contacted Defendant a number of times about problems with their log home, especially about rain coming in between the logs. Defendant sent workmen over on a number of occasions. They put foam and several cases of silicone caulking between the logs. Drip caps were installed over the windows. The log home, however, continues to leak. Defendant testified that he tried everything he knew to fix Plaintiffs' log home, except to use some chinking compound that had been sent by the Sisson Company. Defendant continued to attempt to repair Plaintiffs' log home until Mr. Fincher ordered Defendant off his property.

Doyle Carter is a shareholder and vice president of Sisson Dupont & Carder Manufacturing Company. The Sisson Company is a subsidiary of Sisson Dupont & Carder Manufacturing Company. Mr. Carter inspected Plaintiffs' log home and found that a number of logs were installed improperly.

He is not sure how this will affect the logs. Mr. Carter testified that this is one of the worst built homes he has ever seen.

The Walton County EMC told Plaintiffs their log home would not qualify for the good cents program or for the heat pump rebate. Log homes do not qualify for the good cents program because the "R" values are too low. The Walton County EMC made Defendant remove his good cents sign from the Springhill Subdivision.

Defendant testified that the Walton County EMC stated that his log homes would qualify for the good cents program if heat pumps were installed and a certain thickness of logs was used. Defendant testified that he believed Plaintiffs' log home would qualify for the good cents program. Defendant testified that he did not learn until after Plaintiffs' log home was built that it would not qualify for the good cents program.

Plaintiffs continue to live in their log home. The utility bills are high and the log home still leaks. Plaintiffs testified that living in the log home is almost unbearable.

Alison Brickman is Defendant's former wife. Defendant talked with Mrs. Brickman in late 1990 or early 1991 about building a log home in the Springhill Subdivision. Defendant told Mrs. Brickman that his log homes would qualify for the good cents program, could be constructed in thirty days, and would qualify for a $500 energy rebate. Mrs. Brickman agreed to buy a log home from Defendant. The closing on Mrs. Brickman's log home occurred on June 20, 1991. Mrs. Brickman testified that construction took two and one-half months, her log home did not qualify for the good cents program, and she did not receive an energy rebate. Mrs. Brickman testified that her windows are not double pane and that her heat pump has never worked properly.

Jane Fincher Sinclair is Mr. Fincher's sister. She wanted to live in the Springhill Subdivision and talked with Defendant about building a log home. Defendant told Mrs. Sinclair that his log homes would qualify for the good cents program. She saw the problems with Plaintiffs' home and decided to

have another builder construct a frame home. Mrs. Sinclair lives next door to Plaintiffs.

Plaintiffs contend that Defendant slandered Mrs. Fincher by stating that he was the father of Plaintiffs' son, Andrew. Mr. Fincher testified that a workman stated that Defendant had said that he was the father of Andrew. The workman did not testify at trial and was not employed by Defendant.[6] Mrs. Fincher testified that she has been confronted by a number of people saying that Andrew does not look like Mr. Fincher. Mrs. Fincher denies having an affair with Defendant. Plaintiffs did not personally hear Defendant say that he was Andrew's father. Defendant testified that he never told anyone that Andrew was his son.

Defendant filed a complaint on June 4, 1992, in the Superior Court of Walton County, Georgia, contending that Plaintiffs had committed slander[7] and had failed to pay for services rendered. Plaintiffs filed a counterclaim for defective construction of their log home and Defendant's alleged slander of Mrs. Fincher. Defendant did not respond to Plaintiffs' motion for summary judgment or to Plaintiffs' request for admissions. The state court entered an order on March 30, 1993, dismissing Defendant's complaint. The state court also granted Mrs. Fincher's motion for summary judgment on her counterclaim for slander and emotional damages, with the amount of damages to be determined by a jury.[8]

The state court called the action for trial on May 24, 1993. Neither Defendant nor his counsel made an appearance. The state court heard testimony from Plaintiffs' witnesses and entered findings of fact and a judgment against Defendant.[9] The state court found that Plaintiffs had decided to purchase a log home to be built by Defendant based on deceitful advertisements and deceitful representations concerning energy efficiency, construction quality, and the time period for construction. The state court found that Plaintiffs' log home contained so many latent defects, code violations, and other construction problems that it had no value and should be torn down. The state court determined that the cost to build a replacement log home was $74,880. The state court found that Defendant willfully misrepresented the time for completion, the quality of construction, and the inclusion of a playroom, which was not built. The state court found that Defendant had slandered Mrs. Fincher's good moral character by falsely stating to numerous third parties that he had an extramarital affair with her and that he fathered Andrew, causing Mrs. Fincher extreme and severe emotional distress, embarrassment, and humiliation. The state court determined that Plaintiffs had incurred ordinary and reasonable legal fees and costs of $6,000.

The state court made the following conclusions of law:

## CONCLUSIONS OF LAW

The Court therefore makes the following conclusions of law and it is hereby Ordered and Adjudged that:

1. The Court finds for [Harley] Fincher on the grounds of negligent construction and breach of contract in the amount of $74,880.00. Said sum is the difference between the value of the log home as built and the costs of reasonable remedial repairs which in this case, based on the testimony of two expert witnesses, requires a total reconstruction of the log home. *Southeastern [Southeast] Consultants, Inc. v. O'Pry*, 199 Ga.App. 125 [404 S.E.2d 299] (1991); *Piedmont Builders, Inc. v. Fullerton*, 157 Ga.App. 126 [276 S.E.2d 277] (1981); *Four Oaks Properties, Inc. v. Carusi*, 156 Ga.App. 422, [274 S.E.2d 783] (1980).

---

**6.** The workman was hired by Mr. Fincher to do some block work at Plaintiffs' log home.

**7.** Mr. Fincher admits that he told and showed prospective home buyers the problems with Plaintiffs' log home. Mr. Fincher testified, however, that his statements were true.

**8.** *Holt v. Fincher,* Civ. Action No. 92–912–0, Order (Superior Ct. of Walton County, Ga. March 30, 1993).

**9.** *Holt v. Fincher,* Civ. Action No. 92–912–0, Final Judgment (Superior Ct. of Walton County, Ga. May 27, 1993).

2. The Court finds that [Terry Holt's] willful and deceitful misrepresentations as to the completion period, the quality of construction and failure to repair constitute clear and convincing evidence of willful misconduct, fraud, wantonness and an entire want of care on the part of [Terry Holt] which raises the presumption of conscious indifference to consequences and the Court therefore awards punitive damages to [Harley] Fincher in the amount of $20,000.00. *Four Oaks Properties, Inc. v. Carusi,* 156 Ga.App. 422 [274 S.E.2d 783] (1980).

3. A Defendant in counterclaim can recover attorneys fees on the prosecution of the counterclaim under O.C.G.A. Section 13–6–11. *Glenn v. Fourteen West Realty,* 169 Ga.App. 549 [313 S.E.2d 730] (1984). The Court finds that [Terry Holt's] actions, including his willful misrepresentations and failure to perform as promised, constitutes bad faith in the making of the contract. The Court further finds that [Terry Holt] has caused the [Finchers] unnecessary trouble and expense and therefore awards [the Finchers] reasonable attorneys fees and costs for the prosecution of their counterclaims in the amount of $6,000.00 under O.C.G.A. Section 13–6–11.

4. The Court finds that [Terry Holt's] false statements with respect to an extra marital affair with [Tammy] Fincher resulting in the birth of a child are untrue and constitute slander under O.C.G.A. Section 51–5–4. *Veazy v. Blair,* 86 Ga.App. 721 [72 S.E.2d 481] (1952). The Court therefore awards [Tammy] Fincher the sum of $50,000.00 for the slander by [Terry Holt].

5. That said sums awarded shall bear interest at the rate of twelve (12%) per cent as provided by law from this date.

Defendant and his wife filed a petition under Chapter 7 of the Bankruptcy Code on June 16, 1993. They scheduled as unsecured, nonpriority, a debt owed to Plaintiffs in the amount of $150,880. This sum represents the judgment rendered in the state court action.

### CONCLUSIONS OF LAW

Plaintiffs contend that Defendant's obligation is nondischargeable under section 523(a)(6) of the Bankruptcy Code.[10] This section provides:

**§ 523. Exceptions to discharge**

(a) A discharge under section 727, 1141[,] 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—

. . . .

(6) for willful and malicious injury by the debtor to another entity or to the property of another entity;

11 U.S.C.A. § 523(a)(6) (West 1993).

In *Chrysler Credit Corp. v. Smith (In re Smith )*,[11] this Court stated:

In *Eaves v. Hampel (In re Hampel )*, this Court stated:

. In order to except from discharge an individual's debt under section 523(a)(6), the party seeking the exception must prove the willfulness and maliciousness of the act from which the debt arose. . . . Willful means intentional or deliberate and cannot be established merely by applying a recklessness standard. *Lee v. Ikner (In re Ikner)*, 883 F.2d 986, 989 (11th Cir.1989); *Chrysler Credit Corp. v. Rebhan,* 842 F.2d 1257, 1262–63 (11th Cir.1988).

Malicious means wrongful and without just cause or excessive even in the absence of personal hatred, spite, or ill will. Malice can be established by a finding of implied or constructive malice. Special malice, a specific intent to harm another, need not be proven. Constructive or implied malice can be found if the nature of the act itself implies a sufficient degree of malice. *In re Ikner,* 883 F.2d at 991.

**10.** 11 U.S.C.A. § 523(a)(6) (West 1993). Although the caption of this adversary proceeding includes the phrase "Objection to Discharge," Plaintiffs do not contend that Defendant should be denied a discharge under section 727 of the Bankruptcy Code.

**11.** 143 B.R. 284 (Bankr.M.D.Ga.1992).

An act of reckless disregard of the rights of others is insufficient to constitute willful and malicious conduct. *American Cast Iron Pipe Co. v. Wrenn (In re Wrenn)*, 791 F.2d 1542, 1544 (11th Cir.1986).

Exceptions to dischargeability are to be construed strictly. *Schweig v. Hunter (In re Hunter)*, 780 F.2d 1577, 1579 (11th Cir.1986). The exceptions to discharge were not intended and must not be allowed to swallow the general rule favoring discharge. *Murphy & Robinson Investment Co. v. Cross (In re Cross)*, 666 F.2d 873, 880 (5th Cir. Unit B 1982).

110 B.R. [88] at 91 [ (Bankr.M.D.Ga. 1990) ].

143 B.R. at 291.

■ Plaintiffs bear the burden of proving the nondischargeability of a debt by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).

■ "The validity of a creditor's claim is determined by rules of state law. Since 1970, however, the issue of nondischargeability has been a matter of federal law governed by the terms of the Bankruptcy Code." *Id.,* at 283–84, 111 S.Ct. at 657–58. "[C]ollateral estoppel principles do indeed apply in discharge exception proceedings pursuant to § 523(a)." *Id.,* at 285 n. 11, 111 S.Ct. at 658 n. 11. "[A] bankruptcy court [should] properly give collateral estoppel effect to those elements of the [state court] claim that are identical to the elements required for discharge and which were actually litigated and determined in the prior [state court] action." *Id.,* at 284, 111 S.Ct. at 658.

Defendant does not contest the validity or amount of Plaintiffs' claim, which arises from the state court judgment. The only issue presented to this Court is whether Plaintiffs' claim is dischargeable in bankruptcy.

In *In re St. Laurent,*[12] the Eleventh Circuit Court of Appeals stated:

Collateral estoppel, or issue preclusion, bars relitigation of an issue previously decided in judicial or administrative proceedings if the party against whom the prior decision is asserted had a "full and fair opportunity" to litigate that issue in an earlier case. Collateral estoppel principles apply to dischargeability proceedings. *If the prior judgment was rendered by a state court, then the collateral estoppel law of that state must be applied to determine the judgment's preclusive effect....* While collateral estoppel may bar a bankruptcy court from relitigating factual issues previously decided in state court, however, the ultimate issue of dischargeability is a legal question to be addressed by the bankruptcy court in the exercise of its exclusive jurisdiction to determine dischargeability.

991 F.2d at 675–76 (emphasis added).

In *Nix v. Hardison,*[13] the District Court for the Northern District of Georgia stated:

In Georgia, the prerequisites to the application of the doctrine of issue preclusion are: (1) that the issue at stake be identical to the one involved in the prior litigation; (2) that the issue has been actually litigated in the prior litigation; and (3) that the determination of the issue in the prior litigation has been a critical and necessary part of the judgment in the earlier action.

712 F.Supp. at 188.

*See also Halpern v. First Georgia Bank (In re Halpern)*, 810 F.2d 1061, 1064 (11th Cir.1987) (application of collateral estoppel to state court consent judgment); *Consolidated Management Services, Inc. v. Halligan,* 186 Ga.App. 621, 368 S.E.2d 148, 154 (Pope, S., dissenting), *aff'd,* 258 Ga. 471, 369 S.E.2d 745 (1988).

In *Usher v. Johnson,*[14] the Georgia Court of Appeals stated:

" 'A somewhat different rule applies in regard to the doctrine of estoppel by judgment, since the latter doctrine has reference to previous litigation between the

---

12. 991 F.2d 672 (11th Cir.1993).

13. 712 F.Supp. 185 (N.D.Ga.), *aff'd,* 891 F.2d 906 (11th Cir.1989).

14. 157 Ga.App. 420, 278 S.E.2d 70 (1981).

same parties, based upon a different cause of action. In the latter case there is an estoppel by judgment only as to such matters within the scope of the previous pleadings as necessarily had to be adjudicated in order for the previous judgment to be rendered, or as to such matters within the scope of the pleadings as might or might not have been adjudicated, but which are shown by aliunde proof to have been actually litigated and determined. (Citing.) Under both rules, in order for the former decision to be conclusive, it must have been based, not merely on purely technical grounds, but at least in part on the merits where under the pleadings they were or could have been involved. Code §§ 110–503, 110–504.'" *Morris v. Ga. Power Co.*, 65 Ga.App. 180, 187, 15 S.E.2d 730 (1941); *Williams v. Richards*, 100 Ga.App. 501, 502, 111 S.E.2d 632 (1959).

"*Upon the party setting up an estoppel by judgment rests the burden of proving it.* [Cit.] It matters not how numerous the questions involved in the suit may be, provided they were tried and decided [Cit.]; for the judgment is conclusive not only of the thing directly decided, but of every fact which was essential to the adjudication. [Cit.] 'Any conclusion which the court or jury must evidently have arrived at in order to reach the judgment or verdict rendered will be fully concluded.'" *Callaway v. Irvin*, 123 Ga. 344, 351(4), 51 S.E. 477 (1905). See generally Davis & Shulman, Ga.Prac. & Proc. 528, §§ 27–3, 27–4 (4th Ed.)

278 S.E.2d at 72 (emphasis added).

■ "In order to successfully plead collateral estoppel (or 'estoppel by judgment' as it is sometimes called), one must prove that the contested issues, even though arising out of a different claim, were actually litigated and decided and were necessary to the prior decision." *Boozer v. Higdon*, 252 Ga. 276, 313 S.E.2d 100, 102 (1984).

■ Under section 523(a)(6), "the three elements necessary for issue preclusion [are whether]: (1) the issue of willfulness and

maliciousness in the bankruptcy proceeding was identical to that issue in the civil [state court] case; (2) the issue of willfulness and maliciousness had been previously litigated; and (3) the determination of the issue of willfulness and maliciousness was a critical and necessary part of the judgment in the earlier civil [state court] case." *Sunco Sales, Inc. v. Latch (In re Latch )*, 820 F.2d 1163, 1166 (11th Cir.1987).

■ In the case at bar, the state court entered an order on March 30, 1993, granting in part and denying in part the motion for summary judgment filed by Plaintiffs in the state court action. Defendant failed to appear when the state court called the action for trial. The state court heard testimony from Plaintiffs' witnesses and entered a final judgment against Defendant. This presents a question of whether there was "actual litigation." Default judgments are generally not entitled to issue preclusion because there was no actual litigation. *See M & M Transmissions, Inc. v. Raynor (In re Raynor)*, 922 F.2d 1146 (4th Cir.1991); *Lombard v. Axtens (In re Lombard )*, 739 F.2d 499 (10th Cir. 1984).

Wright and Miller, in their treatise *Federal Practice and Procedure*,[15] state:

The problem of issue preclusion after a one-sided trial also arises after a defendant answers on the merits and then fails to appear for trial or to offer evidence on particular issues. It is not uncommon for lawyers to describe such events loosely as defaults. Conceptually, however, trial is required to prove any matters that have not been admitted in the pleadings. It is far from clear that issue preclusion should be denied simply because the resulting trial was one-sided.

In *Bishop v. Herwig (In re Herwig)*,[16] the debtor had built a residence for the creditor. The creditor filed a state court complaint, alleging that the debtor had willfully and wantonly constructed the residence in a defective and unworkmanlike manner with the intent to defraud. The debtor filed a pro se answer and counterclaim, but failed to ap-

**15.** 18 C. Wright, A. Miller & E. Cooper *Federal Practice and Procedure*, § 4442, p. 376 (1981).

**16.** 77 B.R. 662 (Bankr.S.D.Ill.1987).

pear at the trial. The creditor presented testimony and submitted exhibits. The state court judge found the debtor to be in default for failing to appear and awarded the creditor compensatory and punitive damages.

After the debtor filed bankruptcy, the creditor filed an adversary proceeding, contending the debtor's obligation was nondischargeable. The creditor contended that collateral estoppel precluded the debtor from contesting that he had acted with intent to defraud. The bankruptcy court agreed and stated:

> The prevailing view is that a default judgment has no collateral estoppel effect since the relevant issues were not actually litigated. However, the present case does not involve the typical default case where the defendant fails to answer or appear, and judgment is then entered in favor of plaintiff. Here, defendant did file an answer and counterclaim, but failed to appear for trial. Furthermore, judgment was entered only after evidence was heard and considered.
>
> .　　.　　.　　.　　.
>
> The Court finds that under the circumstances of this case, all elements of collateral estoppel have been satisfied, and that defendant is therefore precluded from litigating those issues already determined by the state court.

77 B.R. at 664.

In *Goins v. Day (In re Day)*,[17] the creditor filed a state court action against the debtor and her husband, alleging fraudulent misrepresentation in the sale of a residence. The attorney representing the debtor and her husband filed a response. After their subsequent divorce, the debtor proceeded pro se and her former husband retained new counsel. The former husband appeared at trial, but the debtor did not. The creditor obtained a jury verdict and judgment for actual and punitive damages. The debtor's motion to set aside the verdict was denied.

After the debtor filed a Chapter 7 bankruptcy case, the creditor filed an adversary proceeding, contending that the debt was nondischargeable. The creditor contended the bankruptcy court should apply collateral estoppel to the state court jury verdict. The bankruptcy court agreed and stated:

> Debtor also contends that the principles of collateral estoppel should not be applied in this case because the prior state court jury verdict and judgment "is analogous to a default judgment type case because judgment was taken against [Debtor] without giving her an opportunity to testify on the merits."
>
> Debtor is correct that collateral estoppel should not be applied to state court default judgments. However, Plaintiffs' state court jury verdict and judgment is not a default judgment.
>
> .　.　.　.
>
> I believe that the rationale of *Herwig* is persuasive. Debtor's attorney of record in the State Court Action filed an Answer on Debtor's behalf. Although Debtor did not appear at trial, Ronald Day did appear, and Plaintiffs were required to prove all elements of their claim for fraud against both Debtor and Ronald Day in order to obtain their judgment. Therefore, after considering the evidence regarding the State Court Action, I find that Plaintiffs have established that the State Court Action was actually litigated on its merits.

137 B.R. at 339–40.

In *Vaughn v. Quinn (In re Quinn)*,[18] the creditor filed a state court action for breach of contract. The debtor filed an answer but failed to appear at the trial. The creditor presented evidence and oral argument. The state court entered a judgment in favor of the creditor for actual and punitive damages. The debtor filed a Chapter 7 bankruptcy case. The creditor filed a dischargeability complaint and argued that the bankruptcy court should apply collateral estoppel to the state court judgment. The bankruptcy court agreed and stated:

> The Debtor has argued that the requirement that the issue to be precluded here must have been actually litigated cannot be satisfied because the prior determination

---

**17.** 137 B.R. 335 (Bankr.W.D.Mo.1992).

**18.** 170 B.R. 1013 (Bankr.E.D.Mo.1994).

resulted after the Debtor chose not to appear for trial, and the state court entered a default judgment. However, the Debtor's decision not to appear and defend himself at the state court trial does not prevent the invocation of collateral estoppel in this Court. See *Dunn v. Davis,* 168 B.R. 189, 192 (Bankr.W.D.Ark.1994) (citing *Kapp v. Naturelle, Inc.,* 611 F.2d 703, 710 (8th Cir.1979) ("the policies underlying the concept of collateral estoppel require, in general, that a judgment, by default or after full defense, be given full faith and credit by this Court.")) The state court entered its judgment after the Plaintiff presented evidence and argument when the case was called for trial. No part of the judgment relies on the fact that the Debtor did not appear for trial.

The requirement that the issues have been actually litigated has been satisfied because the Plaintiff in the state court proceeding pleaded willful and malicious acts on the part of the Debtor, because the Debtor filed an answer to these charges, and because the state court received evidence on these pleadings. The absence of the Debtor at the trial of the matter is not a bar to the operation of the doctrine of collateral estoppel so long as the matter was directly in issue in the prior proceeding. See *Lovell v. Mixon,* 719 F.2d 1373 (8th Cir.1983).

170 B.R. at 1016–17.

This Court agrees with the reasoning of the *Herwig, Day,* and *Quinn* courts. The Court also notes that Defendant was the plaintiff in the state court action. Thus, Defendant was the party that invoked the jurisdiction of the state court. Having invoked the jurisdiction of the state court, Defendant was not free to simply abandon that action.

Turning to the case at bar, the Court must determine whether Defendant's obligation is nondischargeable under section 523(a)(6). First, the Court must determine whether Defendant is collaterally estopped from disputing the findings and conclusions of the state court. Next, the Court must determine whether the state court's findings and conclusions are identical to the nondischargeability requirements of section 523(a)(6).

(1) *Defendant's alleged slander of Mrs. Fincher*

■ The state court granted Mrs. Fincher's motion for summary judgment on her counterclaim for slander and emotional damages. Defendant had failed to respond to Plaintiffs' motion for summary judgment or to Plaintiffs' request for admissions. This established Defendant's liability. Defendant's liability was determined by the state court because, in granting the motion for summary judgment, the state court was ruling on the merits.[19]

■ "The intentional tort of [slander] meets the requirements of § 523(a)(6) for non-dischargeability when the debtor/author knows the published statements were false," rather than "mere reckless disregard for the truth or falsity of the statement...." *Wheeler v. Laudani,* 783 F.2d 610, 615 (6th Cir.1986).

The state court specifically found that Defendant had made a false statement to third parties that Mrs. Fincher was not of good moral character. The state court found that Defendant's statement was false and that the statement was slander per se. Defendant knew that his statement was false. The Court is persuaded that the state court's award of $50,000 to Mrs. Fincher for Defendant's intentional tort of slander is nondischargeable.

(2) *Defective Construction of Log Home*

■ The state court found against Defendant on the grounds of negligent construction and breach of contract and awarded Mr. Fincher a judgment for $74,880. The state court found from the testimony of two expert witnesses that Mr. Fincher's only remedy was to totally reconstruct his log home.

■ A debt arising from negligence is dischargeable in bankruptcy. But the state court also awarded punitive damages arising

---

**19.** "Summary judgment contemplates a decision on the merits...." *Georgia Dept. of Human*
*Resources v. Holland,* 263 Ga. 885, 440 S.E.2d 9, 11 (1994).

from Defendant's conduct. Under Georgia law, "Punitive damages are not recoverable for mere breach of contract." *Bennett v. Associated Food Stores, Inc.*, 118 Ga.App. 711, 165 S.E.2d 581, 585 (1968).

In *Tower Financial Services, Inc. v. Smith*,[20] the Georgia Court of Appeals stated:

> " '[N]egligence, even gross negligence, is inadequate to support a punitive damage award.' *Colonial Pipeline Co. v. Brown*, 258 Ga. 115, 118(3b), (365 SE2d 827) (1988). Under OCGA § 51–12–5.1(b), which is applicable . . ., it remains the rule that ' " "(s)omething more than the mere commission of a tort is always required for punitive damages. There must be circumstances of aggravation or outrage. . . . There is general agreement that, because it lacks this element, mere negligence is not enough. . . .' " ' " (Citations omitted.) *Ivey v. Golden Key Realty*, 200 Ga.App. 545(1), 408 S.E.2d 811 (1991).

423 S.E.2d at 264.

Section 51–12–5.1(b) of the Georgia Code provides:

**51–12–5.1  Punitive damages.**

. . . .

(b) Punitive damages may be awarded only in such tort actions in which it is proven by clear and convincing evidence that the defendant's actions showed willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences.

O.C.G.A. § 51–12–5.1(b) (Supp.1994).

Thus, it is clear that the state court determined that Defendant's actions arose from tort rather than mere negligent construction or breach of contract. "Thus, because the punitive damages awarded here were unavailable absent an independent finding of [tort], the [state] court's determination that [Defendant's actions showed willful misconduct, fraud, wantonness, *and* an entire want

of care on the part of Mr. Holt which raises the presumption of conscious indifference to consequences] was necessary and critical to its judgment." *In re St. Laurent*, 991 F.2d at 677.

The state court, in describing Defendant's actions, did not make "use of the conjunction 'or' [which lends] itself to several alternative bases of liability." *In re Latch*, 820 F.2d at 1165.

■ Punitive damages can be excepted from discharge under section 523(a)(6). *Palmer v. Levy (In re Levy )*, 951 F.2d 196, 199 (9th Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 2965, 119 L.Ed.2d 586 (1992); *Johnson v. Miera (In re Miera)*, 926 F.2d 741, 745 (8th Cir.1991).

■ In order for a debtor to be nondischargeable under section 523(a)(6), the Court must find that Defendant's actions were intentional or deliberate. The actions must also have been wrongful and without just cause or excessive. The nature of the act itself may imply a sufficient degree of malice. *In re Smith*, 143 B.R. at 291. The state court judgment contains detailed factual findings that are directly relevant to the legal issue presented in the adversary proceeding. The state court found in its judgment that Defendant's actions were willful and wanton. The state court found that Defendant's actions constituted a conscious indifference to consequences. It was not necessary for the state court to use the exact language of the Bankruptcy Code. It is enough that the same issue, the true nature of Defendant's actions, was addressed.

The Court is persuaded that the state court award of $74,880 for defective construction and of $20,000 as punitive damages is nondischargeable.

### (3) *Award of Attorney's Fees*

■ The state court awarded Plaintiffs attorney's fees in the amount of $6,000 under section 13–6–11 of the Georgia Code.[21] The state court found that Defendant acted in

---

20. 204 Ga.App. 910, 423 S.E.2d 257, *cert. denied*, 204 Ga.App. 922, 423 S.E.2d 257 (1992).

21. O.C.G.A. § 13–6–11 (Supp.1994). This section provides:

**13–6–11.  Recovery of expenses of litigation generally.**
The expenses of litigation generally shall not be allowed as a part of the damages; but where the plaintiff has specially pleaded and

bad faith in entering into the contract with Mr. Fincher and that Defendant caused Plaintiffs unnecessary trouble and expense.

Since the specific finding by the state court does not rise to the level of willful and malicious conduct, the $6,000 award of attorney's fees is dischargeable in bankruptcy.

An order in accordance with this memorandum opinion will be entered this date.

### ORDER

In accordance with the memorandum opinion entered this date; it is

ORDERED that the debt of Terry Holt, Defendant, to Tammy Fincher, Plaintiff, in the amount of $50,000 for slander hereby is determined to be nondischargeable; and it is further

ORDERED that the debt of Defendant to Harley Fincher, Plaintiff, in the amount of $94,880 hereby is determined to be nondischargeable; and it is further

ORDERED that the debt of Defendant to Plaintiffs in the amount of $6,000 hereby is determined to be dischargeable.

SO ORDERED this 25th day of October, 1994.

has made prayer therefor and where the defendant has acted in bad faith, has been stubbornly litigious, or has caused the plaintiff unnecessary trouble and expense, the jury may allow them.
O.C.G.A. § 13–6–11 (Supp.1994).